## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 19 2020, 11:08 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

APPELLANT PRO SE

Stephen A. Byrd
Carlisle, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Justin F. Roebel
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Stephen A. Byrd, Sr.
*Appellant*,

v.

State of Indiana,
*Appellee*.

February 19, 2020

Court of Appeals Case No.
19A-CR-226

Appeal from the St. Joseph
Superior Court

The Honorable Elizabeth Hurley,
Judge

Trial Court Cause No.
71D08-1509-F1-12

**Brown, Judge.**

Stephen A. Byrd, Sr., appeals the denial of his motion for return of property. We affirm.

## *Facts and Procedural History*

The relevant facts from Byrd's direct appeal follow:

> In early 2014, Byrd began dating Kenya Belcher, who lived in Mishawaka with her two children. In March, Byrd moved into Belcher's home. There was no formal rental agreement between Byrd and Belcher, but he sometimes gave Belcher money.
>
> On September 14, 2015, Belcher and Byrd "broke up" and she told him that she did not want him to live in her house anymore. Tr. Vol. III at 20. In the ensuing days, Byrd asked Belcher whether he could come back to her house, and she told him "no each time." *Id.* at 23. Belcher then asked her stepmother, Cheryl Ashe, to come and stay with her at Belcher's house, and she did. Belcher and Ashe changed the locks to the doors on the house.
>
> On September 17, Belcher arrived home with her children at about 7:00 p.m., and she started preparing dinner when she smelled cigarette smoke coming from the basement. Belcher went downstairs to investigate, and when she reached the bottom of the stairs and went through a door to the basement, someone struck her in the head. She fell down, and Belcher saw Byrd standing over her. Byrd began stabbing her with a knife. Belcher yelled for help. After Byrd had stabbed her multiple times, Belcher was able to get up, and she ran up the stairs, where she found Ashe and her children near the top of the basement stairs. Belcher kept running and ran out of the house and into the street, and Byrd followed her outside, but he ran in the opposite direction. Belcher eventually made her way back to her house and waited for emergency medical technicians to arrive. After Belcher was transported to a local hospital, she underwent a

diagnostic scan of her head, and she received stitches, staples, and glue to repair the multiple stab wounds.

A few days later, police officers apprehended Byrd after a foot chase. Byrd agreed to give a statement, and he signed a Miranda waiver form. Byrd explained that Belcher had attacked him, and he offered to show the interviewing police officer text messages to support his story. Accordingly, the officer gave Byrd an additional waiver authorizing "a complete search" of his phone, and Byrd signed the waiver. State's Ex. 50. The officer then asked Byrd whether Byrd would let him give the phone to a forensics specialist to search the phone for communications with Belcher, and Byrd agreed. Byrd gave the passcode to his locked phone to the officer. The forensics specialist found multiple text messages between Byrd and Belcher, and he also found several video recordings Byrd had made during the late afternoon of September 17, 2015, depicting Byrd inside Belcher's house saying things like: "She tried to outsmart me, she tried to lock me out of the house"; "I'm faced with a bad decision, it's a decision that I have no choice but to make . . . [and] by the time you see this, I will be dead"; "If you play with somebody, if you play with their emotions, you can die." State's Ex. 64.

The State charged Byrd with attempted murder, a Level 1 felony, and two counts of burglary, one as a Level 1 felony and one as a Level 2 felony. Byrd filed a motion to suppress evidence, namely, the video recordings found on his cell phone. The trial court denied that motion following a hearing. A jury found Byrd guilty as charged. The trial court entered judgment of conviction only for attempted murder, a Level 1 felony, and burglary, as a Level 1 felony, and sentenced Byrd to an aggregate term of seventy years executed.

*Byrd v. State*, No. 71A05-1710-CR-2288, slip op. at 2-4 (Ind. Ct. App. July 20, 2018).

[3] On direct appeal, Byrd argued the trial court abused its discretion when it admitted certain evidence, the evidence was insufficient, and his convictions violated double jeopardy. *Id.* at 2. This Court affirmed. *Id.*

[4] On July 30, 2018, Byrd, *pro se*, filed a Verified Motion for Return of Property and requested the release of his cell phone to the custody of his mother. He asserted the matter was resolved by conviction after trial and the phone was no longer necessary as evidence of any crime. On September 25, 2018, the State filed an objection to Byrd's motion asserting it had reason to believe the phone was purchased by the victim and she had a property interest in the phone.

[5] On December 10, 2018, the court held a hearing on Byrd's motion. Byrd stated the State's position had been that the phone was his property. He acknowledged the phone was purchased in 2015 in an account managed only by Belcher and asserted the phone was in his possession for the entire time since its purchase and was on his person when he was arrested. He referenced a "forth coming PCR," stated he had a strong reason to believe that the phone contained exculpatory evidence, and asserted it contained pictures of his children and other data of sentimental value. Transcript Volume II at 4. The prosecutor argued that, although the phone was in Byrd's possession, Belcher was the rightful owner because she purchased it and the account was in her name.

[6] On direct examination by Byrd, Belcher indicated some of Byrd's paychecks were deposited into her checking account managed only by her but "[o]nly the

times [he was] working" "[a]nd sometimes when [he was] working they weren't always deposited into [her] account." *Id.* at 11. She indicated the phone bill was not paid off until some time in 2016 and the incident occurred in September of 2015. When asked if she considered the phone to be hers, she answered affirmatively. On cross-examination, she indicated that she purchased the phone in October 2014 along with phones for herself and her mother, she and her mother made payments on the account, and she and Byrd "did not have a joint account at all." *Id.* at 16. When the prosecutor asked if there was any account in which she and Byrd deposited money, she answered:

> The times when his money was deposited into my account is when he owed me money. So he would owe me money. When I get this job, I will direct deposit my check in your account because he switched jobs. So it would be on and off. And it wouldn't be a big amount.

*Id.* at 17. When asked the type of things for which Byrd owed her money, she stated: "Buy his kids clothes, let him use money, buying his truck, etcetera. I mean it's so many things." *Id.* She clarified that the money Byrd deposited into the account was reimbursement for expenses or items purchased outside of the typical monthly expenses. She also indicated that she suspended service for the phone but still had to make the payments on it until 2016 and Byrd did not deposit any money into her account after the time of his arrest. On redirect examination, Belcher indicated that when she purchased the three phones in October 2014 one was purchased for Byrd.

[7] The court stated:

The fact is we have testimony. We have a receipt. We have testimony that is the receipt from the purchase of the three phones. There is testimony that the phone was paid for out of an account owned by Mr. [sic] Belcher. The testimony is that at times you deposited money into that account, but that the phone continued to get paid off from the time of your arrest in this manner until all the way until 2016.

So while there may have been some of your funds that, I guess, by virtue of the fact that they were commingled in that account on various occasions could have been used to pay part of that fee, the monthly payment fee. The fact of the matter remains that even if we just look at from the date of your arrest until when the phone was paid off in 2016 Ms. Belcher clearly paid the bulk of that phone.

And therefore I would agree with the state's position based upon all of the evidence in front of me that the phone should not be returned to you as your property. I also think it's difficult at this point to say that it should be returned to anybody because we're in a situation where the case is still sort of to a certain extent ongoing if you are going to be filing post conviction relief – a post conviction relief petition.

And so I think everything as long as the case is still sort of active in that regard evidence should stay where it is and not be returned – you know, not be removed from where it resides in evidence at this time. So sort of for those dual reasons I would not be inclined to release the phone to your mother. And your mother especially is not a person whom the phone – I mean she has no ownership interest in the phone at all. And so I'm . . . going to deny the request to release the phone after seeing the evidence and hearing the testimony.

*Id.* at 23-24.

[8] On December 12, 2018, the court entered an order denying Byrd's motion. On May 20, 2019, he filed a petition for post-conviction relief under cause number 71D08-1905-PC-15, which is still pending.

## *Discussion*

[9] Before addressing Byrd's argument, we observe that although he is proceeding *pro se*, such litigants are held to the same standards as trained attorneys and are afforded no inherent leniency simply by virtue of being self-represented. *See Zavodnik v. Harper*, 17 N.E.3d 259, 266 (Ind. 2014). Byrd argues the phone was not reported stolen by Belcher and the State previously mentioned on several occasions that the phone belonged to him.

[10] The State argues Byrd did not meet his burden to prove he is the rightful owner of the phone and Ind. Code § 35-33-5-5 does not require the return of property to a person who is not the owner. It also contends that, to the extent Byrd asserts it should be estopped from challenging his ownership of the phone because it previously relied on his consent to justify a search of the phone, the Fourth Amendment analysis is not a question of rightful ownership and a person has actual authority to consent to a search of property within their access or control.

[11] A person seeking the return of property seized by the State during an investigation must prove by a preponderance of the evidence that he or she is the rightful owner of the property. *Roy v. State*, 81 N.E.3d 641, 643 (Ind. Ct. App. 2017) (citing *Tracy v. State*, 655 N.E.2d 1232, 1236 (Ind. Ct. App. 1995),

*reh'g denied*, *trans. denied*).  Upon review of the denial of a motion for return of property, we will affirm unless the decision is clearly erroneous and cannot be sustained on any legal theory supported by the evidence.  *Id.*

[12]     Ind. Code § 35-33-5-5 provides in part:

> (c) Following the final disposition of the cause at trial level or any other final disposition the following shall be done:
>
>> (1) Property which may be lawfully possessed shall be returned to its rightful owner, if known.  If ownership is unknown, a reasonable attempt shall be made by the law enforcement agency holding the property to ascertain ownership of the property.  After ninety (90) days from the time:
>>
>>> (A) the rightful owner has been notified to take possession of the property; or
>>>
>>> (B) a reasonable effort has been made to ascertain ownership of the property;
>>
>> the law enforcement agency holding the property shall, at a convenient time, dispose of this property at a public auction.  The proceeds of this property shall be paid into the county general fund.
>
> * * * * *
>
> (d) If any property described in subsection (c) was admitted into evidence in the cause, the property shall be disposed of in accordance with an order of the court trying the cause.
>
> * * * * *
>
> (f) For purposes of preserving the record of any conviction on appeal, a photograph demonstrating the nature of the property, and an adequate description of the property must be obtained

> before the disposition of the property. In the event of a retrial,
> the photograph and description of the property shall be
> admissible into evidence in place of the actual physical evidence.
> All other rules of law governing the admissibility of evidence
> shall apply to the photographs.

[13] The record reveals that Byrd acknowledged the phone was purchased from an account managed only by Belcher. Belcher testified the deposits Byrd made into her account occurred only when he was working, the money he deposited into her account was reimbursement for expenses or items purchased outside the typical monthly expenses, Byrd did not deposit any money into her account after the time of his arrest, and the phone was not paid off until some time in 2016 after the incident occurred in September 2015. She indicated that she considered the phone to be her phone. Based upon the record, we cannot say that Byrd proved by a preponderance of the evidence that he or his mother is the rightful owner of the phone. We cannot say the trial court's decision denying his motion is clearly erroneous.

[14] For the foregoing reasons, we affirm the trial court's order.

[15] Affirmed.

Baker, J., and Riley, J., concur.